## NATIONAL AIRCRAFT MAINTENANCE CORPORATION
### v.
### UNITED STATES.
No. 386–55.

United States Court of Claims.
April 8, 1959.

As Amended July 13, 1959.

Edward R. Finch, Jr., Brooklyn, N. Y., for plaintiff. Albert L. Cox, Washington, D. C., Finch & Schaefler, New York City, and Thomas H. King, Washington, D. C., were on the briefs.

Thomas L. McKevitt, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

WHITAKER, Judge.

Plaintiff, the lessee of the Suffolk County Airport, sues the United States for the alleged taking, for temporary use, of certain land and buildings on the airport grounds, without the payment of just compensation. The taking is not denied, but the defendant claims it was entitled to do so, upon the payment of a fair rental, which it says has been paid, not to plaintiff, but to the person the defendant says was entitled to demand and receive it.

Shortly after the outbreak of World War II the Civil Aernoautics Administration, under a so-called AP–4 agreement with the County of Suffolk, New York, built three runways and a parking area for airplanes on 1198.2 acres of land owned by the County, at a cost of about $1,000,000. It then entered into a lease of the lands from the County, to expire six months after the termination of the existing war. At its expiration defendant had the right to remove all improvements on the property.

The following year the lease was amended to run until June 30, 1967, unless sooner surrendered by defendant. Defendant then spent an additional $3,000,000 in constructing hangars, barracks, and other buildings, and in improving landing facilities.

World War II ended in the fall of 1945. The airport was declared surplus on January 11, 1946, and on February 13, 1947, defendant and the County entered into an agreement called "Surrender of Leasehold", executed in conformity with Regulation 16 of the War Assets Administration, which regulation had been promulgated under the authority of the Surplus Property Act of 1944 (58 Stat. 768).* Under this instrument defendant surrendered its lease on the 1198.2 acres and released and quitclaimed to the County the runways, taxiways, etc., and certain designated buildings, "Excepting, however, from this conveyance all right, title and interest in and to * * * all buildings on the above described premises other than the buildings specifically enumerated above as being conveyed hereunder and reserving to the [United States] the right of removal thereof from the premises * * *." There were 60 or 70 of these buildings, which defendant had constructed for troop barracks.

Thereafter, the buildings were put up for sale. Some few were sold to individuals, who removed them from the premises, as they were required to do under the sales contract. The County was the highest bidder for the remaining 65, which it purchased for $5,600. Since these were on lands owned by the County, they were not required to be removed and they were not removed. These are the buildings defendant is alleged to have taken from plaintiff.

One of the conditions upon which the lease was surrendered provided for the recapture of the premises by the defendant in the event of a national emergency. It provided as follows:

"That during the existence of any emergency declared by the President of the United States of America or the Congress thereof, the Grantor shall have the right without charge, except as indicated below, to the full, unrestricted possession, control, and use of the landing area, building areas and airport facilities, as such terms are defined in WAA Regulation 16, as amended, or any part thereof, including any additions or improvements thereto, made subsequent to the declaration of the airport property as surplus; provided, however, that the Grantor shall be responsible during the period of such use for the entire cost of maintaining all such areas, facilities and improvements, or the portions used, and shall pay a fair rental for the use of any installations or structures

* Now 40 U.S.C.A. § 471 et seq.

which have been added thereto without Federal aid."

Thereafter, on March 8, 1948, about a year after the surrender, the County leased the 1198.2 acres and all buildings and other improvements thereon to Walter F. McGinty. On July 29, 1948 McGinty assigned his lease to plaintiff. The next day plaintiff leased to the Arabian American Oil Company (ARAMCO) 52.5 acres of the land, on which were located the buildings the County purchased from defendant, which are the buildings for the taking of which compensation is sought.[1]

The first question to be considered is the Government's right under the "Surrender of Leasehold" to recapture the buildings in question.

This document gives the defendant the right "to the full, unrestricted possession, control and use of the landing area, building areas and airport facilities, as such terms are defined in WAA Regulation 16, as amended, or any part thereof, including any additions or improvements thereto, made subsequent to the declaration of the airport property as surplus." The foregoing terms, "landing area", "building areas", and "airport facilities" are defined as follows (WAA Reg. 16; 32 CFR, 1946 Supp. § 8316.1(b)):

"(3) 'Airport facilities' means any buildings, structures, improvements, and operational equipment, other than non-aviation facilities, which are used and necessary for or in connection with the operation and maintenance of an airport.

"(4) 'Building area' means any land, other than a landing area, used or necessary for or in connection with the operation or maintenance of an airport.

"(5) 'Landing area' means any land, or combination of water and land, together with improvements thereon and necessary operational equipment used in connection therewith, which is used for landing, take-offs, and parking of aircraft. The term includes, but is not limited to, runways, strips, taxiways, and parking aprons.

"(6) 'Non-aviation facilities' means any buildings, structures, improvements, and equipment located in a building area and used in connection with but not required for the efficient operation and maintenance of the landing area or the airport facilities."

Were these buildings "airport facilities", or were they "non-aviation facilities"? That would seem to depend somewhat on the character of the airport, whether a military or a civilian airport, because the buildings were erected as barracks for troops. Certainly, if the "airport facilities" referred to were facilities for a military airport, barracks for airport personnel "are used and necessary for or in connection with the operation and maintenance of [a military] airport." Inasmuch as the expression "airport facilities" is used in speaking of a possible repossession by the Air Force, it would seem that they must have had in mind facilities for the operation and maintenance of a military airport. If so, defendant had a right to repossess the buildings under the "Surrender of Leasehold."

However, what was done indicates that the defendant did not consider these buildings as "airport facilities", but rather as "non-aviation facilities", for, in the "Surrender of Leasehold" these buildings were specifically excepted from the buildings transferred to the County, and were later put up for sale and sold to the County for a cash consideration. This is significant because, under the

---

1. Suit is brought by plaintiff, instead of by ARAMCO, because of the provision in the lease that, in the event the premises were taken over by defendant, "the Lessee shall assign to the Lessor any and all claims which it may have against the Government for the use and occupation of said premises during the term of said occupation, exclusive of fixture claims based on improvements made by the Lessee as permitted by paragraph Third hereof."

Surplus Property Act of 1944 (58 Stat. 768) and WAA Regulation 16, property necessary for the operation of an airport might be transferred to local governments for other than a cash consideration, but not so as to property not necessary for the operation of the airport, to wit, "non-aviation facilities".

This indicates the parties did not consider these buildings "airport facilities", or, at least, that they were doubtful about whether or not they could properly be so considered. If not, they do not come within the recapture clause.

But, the recapture clause covered not only "airport facilities", but also "any additions or improvements thereto, made subsequent to the declaration of the airport property as surplus." When the defendant repossessed the airport, both it and the County treated these buildings as such additions. The agreement of April 1, 1953, recited that "certain additions and improvements have been made to the airport by the owner," and in a later paragraph it recited:

"It is agreed that the installations or structures added to the airport without Federal Aid for the use of which the Government shall pay a fair rental as provided by the terms of said 'Surrender of Leasehold' consist of the following property:

"(a) The real property described in Exhibit D hereto annexed, containing 52.5 acres of land more or less, except Building T–83; [2] and

"(b) The following buildings as identified on map entitled, 'Suffolk County Airport Building Layout' attached to and made a part thereof as Exhibit E, namely: * * *."

Then follows an agreement to pay to the County Treasurer rent on these buildings of $16,750 per annum.

■ The justification for treating these buildings as additions to the airport facilities, made by the owner after declaration of the airport as surplus, is that the defendant sold the buildings to the County, and the County left them on the airport property. This was treated as the equivalent of the erection of new buildings on the property after it had been declared surplus, and, since the defendant repossessed the airport for use of the Air Force, the barracks for Air Force personnel were properly considered as additions to the "airport facilities." While the parties had doubt about the propriety of treating them as "airport facilities", when the Government was turning them over to the County for operation as a civilian airport, they were properly considered as "airport facilities" when the Government repossessed them for a military airport.

■ At any rate, this is the construction put on the "Surrender of Leasehold" by the parties to it, and this is the best guide to what the parties intended.

■ The next question is, how does this affect plaintiff? It is, of course, bound by the terms of the "Surrender of Leasehold." The lease to McGinty, later assigned to plaintiff, recited that the lessee was familiar with the terms of the original lease on the airport and of the "Surrender of Leasehold" and "this lease and all subleases made hereunder shall be subject to all of the provisions of both such agreements." Not only was the lessee familiar with the terms of the "Surrender of Leasehold", but it must also have known that the parties did not consider these buildings as airport facilities, at least for a civilian airport, and, hence, that no right was reserved to repossess them as such. Whether or not they would be considered as additions to the airport facilities, when it was repossessed by defendant for a military airport, they did not know, but they should have known that they might reasonably be so considered, in which event the defendant had the right to repossess them upon the payment of a fair rental to the County for them.

2. These are the buildings sold to the County by defendant and leased to plaintiff as assignee of McGinty and subleased by plaintiff to ARAMCO.

It seems to us, therefore, that McGinty took a lease from the County with knowledge of the fact that defendant might repossess them under the reservation in the "Surrender of Leasehold." In that event, the defendant's obligation was to pay to the County a fair rental therefor. Upon such payment defendant's obligation is discharged, whatever may be the rights and liabilities as between the County and its lessee. If there is any doubt that defendant has discharged its obligation by the payment of a fair rental to the County, the following provision in the County's lease to McGinty would seem to remove that doubt. The provision reads:

"It is agreed by and between the parties hereto that in the event the airport is requisitioned or taken over pursuant to the provisions of the agreement between the Lessor and the United States Government, such requisition or taking over shall have the effect of extending the term hereof for a period of time equal to the period of such occupancy."

This lease was of the entire 1198.2 acres, including "airport facilities", "landing area", and "building areas", and the buildings in question.

Then came plaintiff's lease to ARAMCO, executed the day after plaintiff acquired McGinty's lease by assignment. This covered only the buildings in question. This lease provided:

"It is agreed that in the event the demised premises are requisitioned or taken over by the Government of the United States or any of its administrative agencies, by condemnation or pursuant to or by virtue of any of the provisions of the instruments hereinbefore recited or otherwise, such requisition or taking over shall have the effect of extending the term hereof for a period of time equal to the period of such occupation, but no rental whatsoever shall be paid by the Lessee for such period of occupation, and any rental paid by the Lessee in advance for a period covering the whole or any part of such period of occupation shall be refunded forthwith pro tanto by the Lessor to the Lessee * * *."

The provision in the lease to McGinty would seem to recognize the defendant's superior right under the "Surrender of Leasehold" to repossess the entire 1198.2 acres and all improvements thereon, for it provided for an extension of the term of the lease for a period equal to the period of occupancy by the defendant. This applied to the entire 1198.2 acres, including the buildings in question. By implication the above provision in McGinty's lease deletes from the term of the lease the period of defendant's occupancy, during which the plaintiff's duty to pay rent to the County was suspended. That duty with the corresponding right of possession was revived only when the defendant's occupancy terminated.

Plaintiff's own interpretation of its lease seems to conform to this as evidenced by the terms of its lease to ARAMCO, which applied only to the buildings in question. This provided for an extension equal to the period of the defendant's occupancy, and it expressly absolved ARAMCO from liability for rent during the period of the defendant's occupancy.

If the period of defendant's occupancy was to be deleted from the lease to McGinty and ARAMCO, then defendant's obligation was to pay the rent to the County. This has been done and plaintiff is not entitled to recover.

It results that plaintiff's motion for summary judgment must be overruled, and that defendant's like motion must be sustained and plaintiff's petition must be dismissed except as to plaintiff's claim for the alleged taking of any personal property of the plaintiff other than the personal property listed in the "Supplemental Instrument of Transfer", filed as plaintiff's Exhibit A–7.

It is so ordered.

JONES, Chief Judge, and LARAMORE and MADDEN, Judges, concur.